Fremont-Smith, J.
The plaintiffs, Robert L. Bombardieri (“Bombardieri”) and B&T Express, Inc. (“B&T”), brought this action against the defendant, Jerold Gnazzo, in his official capacity as Registrar of Motor Vehicles for the Commonwealth of Massachusetts (“Registrar”), seeking a declaratory judgment and injunctive relief arising out of the Registrar’s implementation of the Distributed Registration and Information Vehicle Entry (“DRIVE”) Program. The plaintiffs now move that this Court issue a preliminary injunction, pursuant to Mass.R.Civ.P. 65(b), enjoining *234 the Registrar from continuing to operate the DRIVE Program. After hearing and the Court’s consideration of the submissions of the parties, the Court DENIES the plaintiffs’ motion for preliminary injunction.
BACKGROUND
On or about December 12, 1996, the plaintiffs filed a Verified Complaint against the defendant seeking a judgment declaring that the DRIVE program, which (1) permits automobile dealerships to access the computer database of the Registry of Motor Vehicles (“RMV”); (2) authorizes automobile dealerships to collect motor vehicle sales taxes and transfer them to the RMV via electronic funds transfer; and (3) authorizes automobile dealerships to issue permanent certificates of registration, license plates and decals, is unlawful in that it violates M.G.L.c. 90, §30A, M.G.L.c. 64H, §§3(c) and 25, M.G.L.c. 66A, §1 et seq., and 830 CMR 64H.25.1(4)(b). Bombardieri further alleges that the DRIVE program is an “end run” around vital protections and privacy rights to which he is entitled as a citizen and taxpayer and requests that this Court permanently enjoin the defendant from continuing to operate the DRIVE Program (or any other similar program) which is violative of the aforementioned statutes.
It is undisputed that the plaintiff, Bombardieri, is a motor vehicle owner, citizen and taxpayer of the Commonwealth of Massachusetts, and is the Chief Executive Officer and a shareholder of the corporate plaintiff, B&T. It is further undisputed that B&T is a Massachusetts corporation that assists automobile dealers, insurance companies and leasing agents in processing new or transferred motor vehicle registrations, sales taxes, and other similar transactions at the RMV. Specifically, B&T employees, known as “runners , ” pick up completed RMV-1 Forms[1] at automobile dealerships, travel to insurance companies to secure the required insurance stamp, and drop off the completed RMV-1, sales tax checks and assorted other documentation at the RMV. After obtaining RMV approval of the registration application, the runner returns to the automobile dealership with the completed certificate of registration, license plates and decals.
In April 1995, the Registrar, pursuant to 540 CMR §2.05, implemented a pilot program known as the Distributed Registration and Information Vehicle Entry (“DRIVE”) Program, through which seven area automobile dealerships were authorized to perform functions traditionally reserved for the RMV, including (1) issuing permanent certificates of registration; (2) issuing license plates and decals; and (3) processing address and name changes.[2] It is undisputed that Frost Motors, one of B&T’s clients, joined the DRIVE Program in June 1995, causing B&T to suffer a slight decline in its overall business and a ninety percent (90%) decline in its business with Frost. To accomplish the goals of the DRIVE Program, the Registrar established an “electronic link between .the RMV and [the]
authorized pilot dealerships,” and hired a third party network provider, Computerized Vehicle Registration, Inc. (“CVR”), to develop, maintain and monitor the electronic link system. See DRIVE into the Future: Participant Workbook at 6. Pursuant to the DRIVE Program’s CVR electronic link, authorized automobile dealers are permitted to access information, potentially as soon as a customer drives onto the dealership lot, which is contained in the RMVs Automated License and Registration System (“ALARS”), including, inter alia, a customer’s name, address, date of birth, license number,[3] insurance company, Vehicle Identification Number, the existence of any lienholders, credit information, and driving history. Emphasizing that there is nothing to prevent a dealership from obtaining access to RMV information even prior to completion of any sale, the plaintiffs contend that affording automobile dealers access to such information gives them a competitive advantage in negotiating the terms of the purchase, while the defendant maintains that the information available to dealerships participating in the DRIVE Program is public record information which is, in any event, available by other means to members of the general public.
Pursuant to the DRIVE Program, authorized automobile dealerships are provided with a controlled inventory of official RMV supplies, including license plates, decals, blank certificates of registration and official registry stamps. The Registry maintains that through controlled monitoring of its inventory it can adequately guard against fraudulent use of RMV supplies, while the plaintiffs contend that the potential for fraud, abuse and possible criminal activity is great.
Under the terms of the DRIVE Program, automobile dealerships are further authorized to collect Registry and Massachusetts Sales Tax fees directly from customers, which payments are then electronically transferred from the dealership’s own account to a designated Registry account via CVR electronic funds transfer. The plaintiffs assert that such electronic funds transfers are violative of M.G.L.c. 64H, §§3(c) and 25, as well as 830 CMR 64H.25.1(4)(b), while the defendant contends that 830 CMR 64H.25.1(4)(b)2 specifically authorizes automobile dealers to collect sales tax fees from customers and further maintains that it has filed, as of December 13, 1996, an amendment to 830 CMR 64H.25.1(4)(b) allowing for payment of sale taxes by electronic funds transfer, which amendment, effective December 27, 1996, specifically authorizes (1) dealer payment of sales taxes on behalf of others; and (2) payment of motor vehicle sales taxes via electronic funds transfer. See 830 CMR 64H.25.1(4)(b)l and 830 CMR 64H.25.1(4)(b)4.
Finally, it is undisputed that the Registry is planning to expand the DRIVE Program to up to five *235 hundred dealerships in the Commonwealth. See DRIVE Business Design at 26.
The plaintiffs, Bombardieri and B&T, now move that this Court issue (1) a preliminary injunction enjoining the defendant from further operation of the DRIVE Program: and (2) a judgment to the effect that the Program is unlawful in that it violates M.G.L.c. 90, §30A, M.G.L.c. 64H, §§3(c) and 25, M.G.L.c. 66A, §1 et seq., and 830 CMR 64H.25.1(4)(b). The defendant opposes plaintiffs’ motion on the grounds that, inter alia, the DRIVE Program is not illegal and that, in any event, plaintiffs lack standing to bring the action.
DISCUSSION
In determining whether to grant a preliminary injunction, this Court utilizes a balancing test as set forth in Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-617 (1980); see also Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 710 (1990). First, the Court must evaluate, in combination, “the moving party’s claim of injury and its chance of success on the merits.” Id. at 617. If failing to issue an injunction “would subject the moving party to a substantial risk of irreparable harm, this Court must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.” Id. “In the context of a preliminary injunction, the only rights which may be irreparably lost are those not capable of vindication by a final judgment, rendered either at law or in equity." Id. at 617 n. 11. Moreover, in appropriate cases, the Court should also consider the risk of harm to the public interest. GTE Products Corp. v. Stewart, 414 Mass. 721, 723 (1993); Commonwealth v. Mass. CRINC., 392 Mass. 79, 89 (1984); Biotti v. Bd. of Selectmen of Manchester, 25 Mass.App.Ct. 637, 654 (1988).
Addressing first the merits of plaintiffs claim (as distinguished from the question of standing, discussed below), plaintiffs contend that the DRIVE Program, by providing car dealers with access to the Registry’s database, is violative of M.G.L.c. 90, §30A, whereas the Registry contends that §30A prohibits access only to its “computer terminals,” i.e., the hardware and not to the information stored therein (the database).[4]
By specifying that access to the “computer terminals” is to be prohibited “whether for inquiry into computer data files or otherwise,” defendants argue the legislature evinced an intention to prohibit only the use of the hardware itself, rather than to protect the database per se. Defendants further allude to the fact that James W. Ogoe, Supervisor of Public Records, has opined that M.G.L.c. 90, §30A prohibits access only to the Registry’s computer terminals, i.e., the hardware, rather than prohibits access to the database (see Letter from James W. Igoe to James T. McDavitt dated March 20, 1994)[5] and call attention to the fact that the information on the database has, in any event, been held to be “public record” information which is not entitled to “privacy” protection as “personal data” under the Fair Information Practices Act (FIPA), G.L.c. 66A, see: John Doe and others v. Registrar of Motor Vehicles, “Findings of Fact, Rulings of Law and Order" (Middlesex C.A. No. 85-3449, 1 Mass. L. Rptr. 156, June 8, 1993, Gershengorn, J.).
The Court concludes, however, that the somewhat tortured construction of the statute urged by defendants would rob c. 90, §30A of any apparent purpose,[6] and that the most likely intention of the legislature was to protect from public exposure the personal information stored in the Registry’s computer, i.e., in the database. There is, in the Court’s view, a reasonable likelihood that the plaintiffs will succeed on the merits in this regard.
Plaintiffs further contend that the DRIVE Program violates M.G.L.c. 64H, §3(c),which provides: “the [sales tax] imposed by Section two shall be paid by the purchaser to the registrar of motor vehicles in the manner prescribed by the commissioner [of revenue]. The vendor thereof [car dealer] shall not add the tax to the sales price and shall not collect the tax from the purchaser." (Emphasis supplied). Pursuant to the DRIVE Program, however, automobile dealerships are authorized to accept sales tax payments, on behalf of the Registry, from customers, which payments are then transferred via “CVR electronic funds transfer” to a designated Registry account.
As for the prohibition of c. 64H, §3(c) that the “vendor [car dealer] shall not add the tax to the sales price and shall not collect the tax from the purchaser,” defendants argue that the dealers, having been authorized by the DRIVE Program to collect the tax, will not be collecting the tax on their own behalf (which they contend is all the statute was intended to prohibit) but rather on behalf of the Registrar, who is defined as the “Registrar of Motor Vehicles or any person authorized or designated to act on the Registrar’s behalf.” 803 CMR 64H 2.1(2). The Court, however, considers this tortured construction to be a circumvention of what appears to be a clear statutory prohibition against car dealers collecting the sales tax, and concludes that the plaintiffs have a likelihood of success on the merits in this regard as well..'
As justification, defendants assert that regulations promulgated by the Commissioner of Revenue permit the sale tax to be paid by a “personal or business check drawn on the account of a Massachusetts dealer, Massachusetts lessor, insurer, or other business entity which, on its own behalf or on behalf of others, customarily pays to the commissioner or Registrar sales or use taxes on motor vehicles or trailers,” 830 CMR §64H.25.1(4)(b)2, and assert that the Department has also just filed a proposed amendment to 830. CMR 64H.25.1 (4) (b), to become effective December 27, 1996, which will specifically authorize dealers to make electronic transfer of the sales tax to the Registry. It is *236 axiomatic, however, that an agency cannot, by regulation, make legal a practice which is expressly prohibited by statute.
Next, the plaintiffs contend that the DRIVE Program violates M.G.L.c. 64H, §25 which provides:
No certificate of registration shall be issued by the registrar of motor vehicles to the new owner until such new owner shall furnish evidence, on such forms as shall be prescribed by the commissioner and the registrar of motor vehicles, that any tax due under the provisions of this chapter has been paid in accordance with the regulations of the commission.
Since, under the DRIVE Program, authorized automobile dealers are authorized to accept payment of sales taxes from customers and to transfer such payments, via CVR electronic funds transfer, to the Registry at the close of each business day, plaintiffs argue that the Program permits the issuance of registrations each day prior to receipt by the Registry, at the close of day, of the tax payments. The defendants urge, however, that §25 merely requires that the purchaser “furnish evidence” that the tax due has been paid prior to issuance of the registration, and contend that such evidence is furnished, through an electronic communication from the dealer to the RMV, before a registration is issued. See: “Supplemental Affidavit of David Lewis.” As this appears to meet the .statutory requirements, the Court concludes that plaintiffs do not have a likelihood of success in this argument.
Fair Information Act
Additionally, citing Doe v. Registrar of Motor Vehicles, 26 Mass.App. 415 (1988), plaintiffs maintain that the DRIVE Program is violative of the Fair Information Practices Act, M.G.L.c. 66A, §§2(f) and 2(g) (“FIPA”), which expressly requires that any holder of personal data in a computerized database must
maintain a complete and accurate record of every access to and every use of any personal data by persons or organizations outside of or other than the holder of the data, including the identity of all such persons and organizations which have gained access to the personal data and their intended use of such data . . ."
whereas the DRIVE Program does not provide for the maintenance of such records. Plaintiff also contends there is a violation of c. 66A, §2(g), which provides:
to the extent that such material is maintained pursuant to this section, make available to a data subject upon his request in a form comprehensible to him, a list of the uses made of his personal data, including the identity of all persons and organizations which have gained access to the data . . ."
whereas the DRIVE Program provides no mechanism for notification to a person of the use of his or her personal information.
However, in Doe v. Registrar of Motor Vehicles, supra, the Supreme Judicial Court determined that the information concerning social security numbers, date of birth and physical heights, as contained in license applications, was not a “public record” and that it could be disclosed upon a showing by the Registrar that disclosure would serve some public or governmental purpose, and remanded the case to the Superior Court for additional findings. On June 8, 1993, the Superior Court found that the Registry had demonstrated a “strong public and governmental interest in making the information at issue available to the public.” John Doe v. Registrar of Motor Vehicles, Middlesex Superior Court, CANo. 95-3449, 1 Mass. L. Rptr. 156 (Findings of Fact, Rulings of Law & Order, Gershengorn, J.). Although an appeal of this decision is pending, it cannot be said that plaintiffs, at this juncture, have a likelihood of success in proving a violation of FIPA.
Threat of Irreparable Harm
While plaintiffs have alleged in general terms a potential for fraud and abuse arising out of the DRIVE Program, and expressed an apprehension of abuse which is not unreasonable,[7] no hard evidence has been proffered of any abuse in the Program, which has been in effect, on a limited basis, for two years. Other than the threat of economic injury to B&T Express, Inc., which the Court concludes below may lack standing, plaintiffs have failed to show any concrete facts to substantiate a threat of immediate irreparable injury.
Standing
It is settled law that a party has standing to bring a declaratory judgment action only when the party can “allege an injury within an area of concern of the statute or regulatory scheme under which the injurious action has occurred.” Massachusetts Ass’n of Cosmetology Schools, Inc. v. Bd. of Registration in Cosmetology, 40 Mass.App.Ct. 706, 708 (1996) (quoting Massachusetts Ass’n of Indep. Ins. Agents and Brokers, Inc v. Commissioner of Insurance, 373 Mass. 290, 293 (1977)). “The purpose of both the ’’actual controversy" and the standing requirement is to ensure the effectuation of the statutory purpose of M.G.L.c. 231A, which is to enable a court ‘to afford relief from . . . uncertainty and insecurity with respect to rights, duties, status and other legal relations.’ “ Bello v. South Shore Hosp., 384 Mass. 770, 778 (1981) (quoting Massachusetts Ass’n of Indep. Ins. Agents and Brokers, Inc. v. Commissioner of Ins., 373 Mass. 290, 292 (1977)).
As for the plaintiff Bombardieri, while it is clear that his allegations that the DRIVE Program violates M.G.L.c. 90, §30A, M.G.L.c. 64H, §§3(c) and (25), M.G.L.c. 66A, §1 et seq., and 830 CMR 64H.25.1(4)(b) raise an actual controversy, Santana v. Registrars of Voters of Worcester, 384 Mass. 487, 493 (1981), Bombardieri raises only generalized concerns regard *237 ing the impact of the DRIVE Program on his rights as a motor vehicle owner, citizen and taxpayer. As in Tax Equity Alliance for Massachusetts v. Commissioner of Revenue, 423 Mass. 708, 711 n.6 (1996), where the plaintiffs did not “allege” any individual harm as a basis for standing," but “appear to be concerned that the act will lead ultimately to the overall loss of tax revenues, this general allegation of harm does not fulfill the requirement that the plaintiffs’ rights must be impaired in order for them to maintain standing . . .” Cf. Mitchell v. Secretary of Administration, 413 Mass. 330, 333 n.7 (1992) (holding that plaintiffs, individuals and organizations who stood to benefit from increased expenditures on road and bridge construction, had standing to sue when the balance in the Highway Fund was significantly decreased as a result of a transfer of funds from the Highway Fund to the General Fund). In short, this Court concludes that Bombardieri is not likely to establish that he is “one who, by virtue of a legally cognizable injury, is a person entitled to initiate judicial resolution of the controversy.” Massachusetts Ass’n of Indep. Ins. Agents and Brokers, Inc. v. Commissioner of Insurance, 373 Mass. 290, 293 (1977).
As for the plaintiff B&T Express, Inc., although “[standing requirements should be liberally construed for declaratory judgment purposes,” a party must nevertheless assert a legally cognizable injury to which end an “injury derived from business competition is [generally) not sufficient to confer standing.” Id. at 708-09. Generally, one injured by being subjected to business competition by a state agency or its authorized parties has no standing to seek injunctive relief. Nantucket Boat, Inc. v. Woods Hole, Martha’s Vineyard & Nantucket SS Auth., 345 Mass. 551, 553 (1963). “This rule does not apply, however, to competitors in a regulated industry . . . who are attempting to challenge governmental action threatening their competitive position.” Everett Town Taxi, Inc. v. Aldermen of Everett, 366 Mass. 534, 538 (1974); see also South Shore Nat’l Bank v. Bd. of Bank Incorporation, 351 Mass. 363, 366-68 (1966) (special circumstances attendant in regulated industry render plaintiff “sufficiently aggrieved” to have standing to challenge Board of Bank Incorporation decision to allow competitor to locate branch office in same locality).
Similarly, the Supreme Judicial Court has held, in a challenge brought by insurance agents and brokers to the Commissioner’s interpretation of a statute and a regulation issued pursuant to that interpretation:
[t]o rule that agents or brokers lack standing and that only insurers could be proper plaintiffs would mean that insurance companies by their own inaction in failing to challenge the regulation could unilaterally limit, in a matter not envisioned by the Legislature, the ability of brokers and agents to operate effectively in the marketplace. This would create the potential of a lessening of the role and vitality of such persons not because of marketplace considerations but as a result of administrative actions of the commissioner.
Massachusetts Ass’n of Indep. Ins. Agents and Brokers, Inc. v. Commissioner of Ins., 373 Mass. 290, 296 (1977).
Although here, as in Massachusetts Ass’n of Indep. Ins. Agents & Brokers, supra, it is difficult to envision just who would have standing if plaintiffs do not, it is also true that, even in the context of an indisputably regulated industry, standing was viewed in a recent Supreme Judicial Court decision as a “close question, determined in the plaintiffs favor only because the contested construction of a private electrical generating plant would not enhance the competition for consumers but would instead eliminate certain consumers from the competitive market available to the plaintiff.” Massachusetts Ass’n of Cosmetology Schools, Inc. v. Board of Registration in Cosmetology, 40 Mass.App.Ct. 706, 709 n.4 (1996) (citing Boston Edison Co. v. Boston Redev. Auth., 374 Mass. 37, 44 (1977)).
Here it is far from clear, even in view of the regulatory scheme surrounding the operation of the RMV and the DRIVE Program, that plaintiffs’ business (e.g. facilitation of the automobile registration process through the transportation of documents, tax payments and registration applications between automobile dealerships, insurance agencies and the RMV) can be properly considered to be part of a “regulated industry.” Under these circumstances, the Court cannot confidently conclude that plaintiffs have a likelihood of success in proving they have standing.
Although the Court denies plaintiffs’ motion for preliminary injunctive relief, the Court does recognize that plaintiffs have raised substantial questions, as to some of which they have established a probability of success on the merits (see above), but for their lack of standing. Although there is a right to an immediate interlocutory appeal form the denial of a preliminary injunction to a single justice of the Appeals Court, the Court considers that a better avenue of expedited appellate consideration of the important issues raised might be by way of an appeal from a final judgement, based on’the undisputed facts, on cross motions for summary judgment, if such were to be sought by the parties.
ORDER
For the above reasons, plaintiffs’ motion for preliminary injunction is DENIED.

The Registry of Motor Vehicles requires that the RMV-1 Form be used by all motorists applying for motor vehicle registrations.

Participation in the DRIVE Program is by permit issued by the RMV pursuant to 540 CMR 2.05(7) and is subject to *238 the terms and conditions attached by the Registrar. Among the terms and conditions of participation in DRIVE are the requirements that the dealership (1) post a surety bond in a minimum amount of $ 10,000; (2) maintain an insurance policy in the amount of $ 1,000,000; and (3) remain in good standing with the Department of Revenue. See Lewis Aff. Paragraph 3.

In Massachusetts, unless a motorist requests otherwise, his or her Massachusetts driver’s license number is his or her social security number.

M.G.L.c. 90, §30A provides: “the registrar shall not allow direct or indirect use of the computer terminals under his control, whether for inquiry into computer data files or otherwise, except by persons employed by the commonwealth or a political subdivision thereof, law enforcement agencies, the special investigative unit of the plan created pursuant to section one hundred and thirteen H of chapter one hundred and seventy-five only to the extent authorized therein, insurance companies and their authorized agents and service carriers to the extent authorized in the safe driver insurance plan and for the purposes of complying with the requirements of Sections one A, thirty-four A, thirty-four B and thirty-four H pertaining to motor vehicle liability policies and the trial courts or computer manufacturers or data processing consultants under contract with the commonwealth.”

In this letter, however, Mr. Igoe reversed an earlier opinion letter in which the Supervisor of Public Records interpreted the statute, as do the plaintiffs, to prohibit access to the database.

See, in this respect, the affidavit of David S. Mofenson, who was chairperson of the legislature’s Privacy Commission, and who drafted the amendment which became §30A in 1972, who states that the purpose of the amendment was “to protect the privacy rights of Massachusetts motorists by preventing private companies and individuals from obtaining direct or indirect access to information stored in the Registry of Motor Vehicles’ computer database, including, but not limited to, information about motor vehicle registrations, insurance information, and license suspensions and revocations. . . .’’

As noted, the Program entrusts collection of the tax receipts to car dealers and relies upon them to properly account to the Registry for such receipts. It further entrusts the car dealers and their employees with bulk shipments of care registration certificates and decals, to be filled in and issued by the car dealer.